Craig A. Brandt (SBN 133905)
LAW OFFICE OF CRAIG A. BRANDT
5354 James Avenue
Oakland, CA 94618
Telephone: (510) 601-1309
Email: craigabrandt@att.net

Attorney for Plaintiff
EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC, a California limited liability company,<br><br>                    Plaintiff,<br><br>          vs.<br><br>EMCORE CORPORATION, a New Jersey State foreign corporation, and DOES 1-10, inclusive,<br><br>                    Defendant. | Case No:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

## INTRODUCTION

1.  This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendant for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2.  Defendant Emcore Corporation. ("EMCORE") maintains an industrial site in Concord, California and is the subject of this suit.

3.  On or about November 15, 2023, EDEN provided a Notice of Defendant's violations to EMCORE, by certified mail to its agent for service of process CSC-Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California, 95833, as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

4.  On or about November 13, 2024, EDEN also provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board"), (4) EMCOR's CEO, Jeffrey Ritticher.

5.  A copy of EDEN's Notices of Intent to Sue is attached hereto as Exhibit A and is incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").")

6.  More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendant, the State Water Resources Control Board ("State Board"), and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(g).

**JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

7.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C.

1   sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil

2   penalties).

3       8.   The Permit under which this case arises is a federally required permit based upon

4   California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment*

5   *Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of*

6   *Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016).)

7       9.   By its express language, a violation of the State permit constitutes a per se violation of the

8   Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ,

9   NPDES Order No. CAS000001, Section XXI.A)

10       10.   Venue is proper because Defendant reside in and the events or omissions giving rise to

11   EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper

12   because the Facility's CWA violations have occurred and are occurring within the District. 33

13   U.S.C. § 1365(c)(1).

14   **PARTIES**

15       11.   Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an

16   environmental membership group organized under the laws of the State of California as a limited

17   liability company on June 1, 2018.  EDEN previously existed as an unincorporated

18   environmental citizen's association, with members who remain associated with EDEN as of the

19   date of the filing of this Complaint.

20       12.   EDEN's organizational purpose is the protection, preservation and enhancement of

21   California's waterways.  Its mission is implemented by enforcing the provisions of the Federal

22   Clean Water Act and California's Industrial General Permit by seeking redress from

23

24

environmental harms caused by Industrial Dischargers who pollute the Waters of the United States, through community education and citizen suit enforcement when necessary.

13.  EDEN's members donate their time and money resources to protect, enhance, and assist in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.

14.  EDEN has members that reside, work and pursue recreational activities near the affected Receiving Waters. Defendant EMCORE discharges storm water into a municipal storm drain system that then discharges into Suisun Bay, a tributary of the San Francisco Bay which is the "Receiving Waters" for the Facility. EDEN members use those waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study. Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendant's failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

15.  EDEN has standing as an association to bring this suit against Defendant, as at least one of EDEN's current members is experiencing ongoing and continuing harm particular to him or her as a specific result of Defendant's violations of the CWA, and the resulting adverse effects to the environment and the Receiving Waters downstream from the Facility, and has experienced such harm since at least the date that EDEN provided to Defendant a 60-day Notice of Intent to Sue.

16.  Specifically, the individual member(s) who are experiencing harm from Defendant's violations of the CWA are reluctant to utilize the Receiving Waters downstream from the Facility as specified in Paragraph 14, above, due to the pollution caused by Defendant's environmental violations that EDEN's members believe has entered into the Facility's Receiving

Waters; and the aesthetic and recreational interests of these members has been adversely impacted.

17. Defendant's ongoing violations of the California Industrial General Permit and the CWA have and will continue to cause irreparable harm to EDEN and certain of its current members, for which they have no plain, speedy, or adequate remedy. The relief requested will redress the ongoing injury in fact to EDEN and its members. Litigation of the claims asserted and the relief requested in this Complaint will not require the participation in this lawsuit of individual members of EDEN.

18. EDEN is informed and believes, and on such information and belief alleges, that Defendant EMCORE was formed on or about March 11, 2000, as a New Jersey corporation.

19. EDEN is informed and believes, and on such information and belief alleges, that, Defendant EMCORE, on or about March 27, 1992, submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility. EDEN is further informed and believes, and on such information and belief alleges, that on or about April 14, 2015 Defendant EMCORE, submitted an NOT to be authorized to discharge storm water from the Facility under the California Industrial General Permit ("General Permit") and was assigned Waste Discharger Identification number ("WDID") 2 07I001332, according to the Regional Water Board's records.

**STATUTORY BACKGROUND**

20. Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

21.  Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

22.  Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

23.  Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

General Permit

24.  The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.  The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

25.  In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

26.  The General Permit contains several prohibitions. Effluent Limitation Section V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition Section III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

27.  Receiving Water Limitation Section VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

28.  In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

29.   Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, Section X.C. These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

30.   To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, Section X.B.

31.   Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet Section I .1.

32.   Sections X.D – X.I of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges.

33.   The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs,

storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, Section X.H.2.  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

34.   The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, Section X.H.4, 5.

35.   The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

36.   As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

37.   Section XI.B of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

38.   A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit Section XI.B.2.

39. Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into Storm Water Multiple Application and Report Tracking System (SMARTS) the resulting laboratory reports within 30 days from receipt of the report. General Permit Section XI.B.4.

40. Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event. General Permit, Section XI.A.

41. The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, Section XV.

42. Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. General Permit, Section XI.B.6.c.

43. The United States EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

44.   The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

45.   The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("S.U."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L.

46.   An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit Section XII.A.

47.   When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit Section XII.C.

48.   For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  General Permit Section XII.D.

49.   Section XVI.A of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

50.   Furthermore, Section XXI.L of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible Person ("LRP") or Duly Authorized Representative ("DAR") of the Facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

51.   Section XXI.N of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both.  *See also* Clean Water Act section 309(c)(4)

San Francisco Bay Regional Basin Plan

52.   The Water Quality Control Board, San Francisco Bay Region has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by Resolution No. R2-2010-0100, setting forth the Water Quality Standards ("WQS") and beneficial uses for San Francisco Bay and its tributaries.

53.   The Beneficial Uses for San Francisco Bay are industrial service supply, shellfish

1   harvesting, fish migration, preservation of rare and endangered species, fish spawning,

2   commercial and sport fishing, estuarine habitat, wildlife habitat, recreational activities involving

3   contact with water, recreational activities involving proximity to water, and navigation. *See*

4   Basin Plan, Table 2-1.

5   54.  Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin

6   Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water

7   Act, 33 U.S.C. § 1313(d).

8   55.  Polluted discharges from industrial sites, such as the Facility, contribute to the degradation

9   of these already impaired surface waters and aquatic-dependent wildlife. Discharges of pollutants

10  at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving

11  the discharges.  WQS applicable to dischargers covered by the Storm Water Permit include, but

12  are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants

13  for the State of California ("CTR"), 40 C.F.R. § 131.38.

14  56.  The Basin Plan sets forth, among other things, narrative WQS for floating material, Oil &

15  Grease, sediment, settleable matter, and suspended materials, and sets forth numeric WQS for

16  pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium, silver,

17  tributyltin, zinc, and hydrocarbons ("PAHs"). *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-

18  3.3.14, 3.3.21, and Table 3-3.

19  57.  The Basin Plan also includes site specific objectives ("SSOs"), which are WQS for specific

20  sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan, Table 3-3A.

21  The CTR includes numeric criteria set to protect human health and the environment in the State

22  of California.

23

24

58.  Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitations in Section VI.A of the General Permit.

### Water Quality Impairment Area

59.  The San Francisco Bay is listed for water quality impairment on the most recent Section 303(d) - list of the General Permit for the following: chlordane; dichlorodiphenyltrichloroethane (DDT); dieldrin; dioxin compounds (including 2,3,7,8- tetrachlorodibenzo-pdioxin); furan compounds; invasive species; mercury; polychlorinated biphenyls (PCBs); PCBs (dioxin-like); selenium, and trash.

### Citizen Suit Provision of the CWA

60.  Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1). No action may be commenced "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the [EPA] Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

61.  In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation occurring before

1    November 2, 2015, and $51,570.00 per day per violation for violations occurring after November

2    2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

3    62.   Violations of provisions of the General Permit, including those detailed below, constitute

4    violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§

5    1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

6    **FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS**

7    Defendant EMCORE is part of the industry that is primarily engaged in manufacturing

8    electronic components, not elsewhere classified, such as receiving antennas, switches, and

9    waveguides.

10    63.   EDEN is informed and believes that the Facility falls primarily within the standard

11    industrial classification ("SIC") Code 3679 – Electronic Components, Not Elsewhere Classified.

12    The General Permit requires establishments designated under SIC Code 3273 to test for the

13    following analytical parameters: pH, Total Suspended Solids (TSS), and oil and grease (O&G).

14    Table 2, of the General Permit.

15    64.   According to the EPA's Storm water Discharge Mapping Tools the Facility discharges

16    storm water into the Municipal Separate Storm Sewer System ("MS4") that then discharges into

17    the Suisun Bay, a tributary of the San Francisco Bay which is the "Receiving Waters" for the

18    Facility. *(*EPA's Storm water Discharge Mapping Tools, *available at*

19    *https://www.epa.gov/npdes/epas-stormwater-discharge-mapping-tools*.)

20    65.   Suisun Bay has the largest uninterrupted estuarine marsh remaining on the western

21    coast of the contiguous United States. The marsh's central location in the northern San Francisco

22    Estuary makes it an important nursery and highway for estuarine and migratory fishes, such as

23    Chinook salmon and striped bass. Suisun Marsh also contains vital habitats for many other

24

animals, including the endangered salt marsh harvest mouse and the declining western pond turtle.

66. EDEN is informed and believes that Defendant EMCORE stores industrial materials outdoors and/or on-site that can be exposed to storm water, or can be tracked outside from spills and leaks, that otherwise contaminates the surrounding watershed.

67. EDEN is informed and believes that based on its investigation, including a review of the Regional Water Board's records and aerial photography storm water is collected and discharged from the Facilities through a series of channels that discharge via at least one outfall. The outfall discharges storm water and pollutants contained in that storm water that eventually discharges into the San Francisco Bay, a navigable Water of the United States.

68. Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facilities where industrial activities occur and areas where airborne materials associated with the industrial processes at the facilities may settle onto the ground. Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, chemicals and other pollutants as it flows towards the storm water channels.

69. On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facilities. Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facilities are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

Deficient SWPPP and Site Map

70.  On information and belief, Plaintiff alleges that since at least the beginning of the Facility's operations, Defendant EMCORE has failed to develop an adequate SWPPP and a Site Map for the Facility as detailed in Plaintiff's 60-Day Notices attached hereto as Exhibit A, incorporated herein by reference. Exhibits A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act"), *Deficient/Invalid SWPPP and/or Site Map*, pp. 4-8, (a) – (q).

71.  On information and belief, EDEN alleges that the Facility has failed to upload an adequate revised SWPPP and Site Map pursuant to Section X *et seq*. of the General Permit.

Monitoring and Reporting – Monthly Visual Observations

72.  On information and belief, EDEN alleges Defendant EMCORE does not have an adequate storm water monitoring program at its Facility since at least the beginning of the Facility's operations, as required by Section XI.A of the General Permit.

73.  On information and belief, EDEN alleges that Defendant has failed to conduct monthly visual observations of storm water discharges at the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

74.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, pH affected substances, TSS, and O&G, are being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Collect and Analyze the Required Number of Storm Water Samples

75.  The Defendant EMCORE is required to collect and analyze two storm water samples from the first half of the reporting year (July 1 to December 31) and two storm water samples for the

1    second half of the reporting year (January 1 to June 30), pursuant to Sections XI.B2 and

2    XI.B11.a of the General Permit.

3    76.  On information and belief, Eden alleges that Defendant failed to collect and analyze the

4    required number of storm water samples at the Facility since at least the beginning of the

5    Facility's operations, as required by the General Permit.

6        Missing Storm Water Samples

7    77.  On information and belief, EDEN alleges that during the 2015-2016 reporting year,

8    Defendant did not collect and analyze one (1) storm water sample for the first half of the

9    reporting year and failed to collect and analyze one (1) for the second half of the reporting year.

10    78.  On information and belief, EDEN alleges that during the 2016-2017 reporting year,

11    Defendant did not collect and analyze one (1) storm water sample for the first half of the

12    reporting year.

13    79.  On information and belief, EDEN alleges that during the 2017-2018 reporting year,

14    Defendant did not collect and analyze one (1) storm water samples from the first half of the

15    reporting year.

16    80.  On information and belief, EDEN alleges that during the 2018-2019 reporting year,

17    Defendant failed to collect and analyze one (1) storm water samples from the first half of the

18    reporting year.

19    81.  On information and belief, EDEN alleges that during the 2019-2020 reporting year,

20    Defendant failed to collect and analyze one (1) storm water samples from the first half of the

21    reporting year and failed to collect and analyze one (1) for the second half of the reporting year.

22

23

24

82.  On information and belief, EDEN alleges that during the 2020-2021 reporting year, Defendant failed to collect and analyze two (2) storm water samples from the first half of the reporting year.

83.  On information and belief, EDEN alleges that during the 2021-2022 reporting year, Defendant failed to collect and analyze two (2) storm water samples from the first half of the reporting year and failed to collect and analyze two (2) for the second half of the reporting year.

84.  On information and belief, EDEN alleges that during the 2022-2023 reporting year, Defendant failed to collect and analyze two (2) storm water samples from the first half of the reporting year and failed to collect and analyze two (2) for the second half of the reporting year.

*(A Chart of the above narration is provided for further reference)*

| Reporting Year | QSE's Sampled In First Half | QSE's Required in First Half | **QSE's Missing in First Half** | QSE's Sampled In Second Half | QSE's Required In Second Half | **QSE's Missing in Second Half** |
|---|---|---|---|---|---|---|
| 2015-2016 | 1 | 2 | 1 | 1 | 2 | 1 |
| 2016-2017 | 1 | 2 | 1 | 2 | 2 | 0 |
| 2017-2018 | 1 | 2 | 1 | 2 | 2 | 0 |
| 2018-2019 | 1 | 2 | 1 | 2 | 2 | 0 |
| 2019-2020 | 1 | 2 | 1 | 1 | 2 | 1 |
| 2020-2021 | 0 | 2 | 2 | 2 | 2 | 0 |
| 2021-2022 | 0 | 2 | 2 | 0 | 2 | 2 |
| 2022-2023 | 0 | 2 | 2 | 0 | 2 | 2 |
| Total QSE's Missing | | | **11** | | | **5** |

85.  On information and belief, EDEN alleges EMCORE has failed to have analyze and then upload **11** samples during the first half of the Reporting Year and **5** samples during the second half of the Reporting Year.

86.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, pH affected substances, TSS, and O&G, are being discharged during rain events from the Facility to the San Francisco Bay.

1
2
3
4

<u>Failure to Collect Storm Water Run-Off Samples During Qualified Storm Events</u>

5    On information and belief, EDEN alleges EMCORE samples collected as listed below

6  are not in compliance with the General Permit because they were not collected during Qualified

7  Storm Events (QSE) as defined by the General Permit pursuant to Section XI.B.1.

8    87.  Failure to sample on a QSE results in inaccurate sampling data. It also misrepresents the

9  harmful pollutants present at the Facility. Harmful pollutants can be washed away into creeks,

10  rivers, and San Francisco Bay without any knowledge. It is EMCORE's responsibility to ensure

11  harmful pollutants are prevented from contaminating the waters of the United States.

12      *(A Chart of the above narration is provided for further reference.)*

| Sample Date | QSE Info |
|---|---|
| 01/19/2016 | Not a valid QSE – 4th consecutive day of rainfall |
| 10/14/2016 | Not a valid QSE – 3rd consecutive day of rainfall |
| 02/17/2017 | Not a valid QSE – 2nd consecutive day of rainfall |
| 04/18/2017 | Not a valid QSE – 3rd consecutive day of rainfall |
| 11/09/2017 | Not a valid QSE – 2nd consecutive day of rainfall |
| 11/29/2018 | Not a valid QSE – 2nd consecutive day of rainfall |
| 02/13/2019 | Not a valid QSE – 2nd consecutive day of rainfall |
| 01/28/2021 | Not a valid QSE – 3rd consecutive day of rainfall |

18
19    88.  Information available to EDEN indicates that as a result of these practices, storm water

20  containing excessive pollutants, including, but not limited to, pH affected substances, TSS, and

21  O&G, are being discharged during rain events from the Facility to the San Francisco Bay.

22    <u>Failure to Deliver Samples to a Laboratory Within 48 Hours of Collection</u>

23    Pursuant to Attachment H, Section 2 of the General Permit, Discharges are required to

24  deliver storm water run-off samples to a qualified laboratory within 48 hours of the date and time

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION

of physical sampling. Required holding times ensure that the sample is analyzed prior to any bio-degradation, oxidation, precipitation, sorption, volatilization, and other physical and chemical processes that may occur and that can affect the integrity of the sample. Samples may become diluted and represent inaccurate data if taken to the laboratory past the required holding times.

89.   On information and belief Plaintiff alleges that Defendant EMCORE did deliver storm water run-off samples to a qualified Laboratory within forty-eight (48) hours for samples that were taken on February 17, 2021.

90.   Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, pH affected substances, TSS, and O&G, are being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Sample Correctly for the Parameter of pH

91.   Pursuant to Section XI.C.2.a of the General Permit, the storm water sample "holding" time for pH analysis is 15 minutes.  The following laboratory reports showed evidence that the litmus test for the Facility's pH was not conducted within the required 15-minute holding time:

| Sample Date | Laboratory Report Date |
|---|---|
| 10/14/2016 | 10/24/2016 |
| 11/09/2017 | 11/21/2017 |

92.   On information and belief, EDEN alleges that EMCORE did not collect pH samples of all drainage areas and deliver them to the Laboratory within 15 minutes. This is evident by the Laboratory Reports stating that pH was analyzed outside the 15-minute holding time.

93.   Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, pH affected substances, TSS, and O&G, are being discharged during rain events from the Facility to the San Francisco Bay.

1

<u>Failure to Upload Storm Water Samples Data (Ad Hoc Data) Within 30 Days</u>

2

94.  Section XI.B.11.a of the General Permit requires EMCORE to submit all sampling and

3

analytical results for all individual or Qualified Combined Samples via SMARTS within 30 days

4

of obtaining all results for each sampling event. An Ad Hoc Report is used to submit monitoring

5

results through SMARTS. In addition, only the (LRP) or the DAR may certify and submit these

6

reports. EMCORE must manually enter these results in the SMARTS system and it is not

7

sufficient to simply upload laboratory reports.

8

95.  On information and belief Plaintiff alleges that Defendant EMCORE failed to manually

9

upload into SMARTS within 30 days the following sampling and analytical results pursuant to

10

Section XI.B.11.a of the General Permit:

11
12

| Sample Date | Date of Laboratory Report | Date Uploaded into SMARTS | Length of Time Late[1] |
|---|---|---|---|
| 11/09/2015 | 11/24/2015 | Not uploaded | 2870 days and counting |
| 01/19/2016 | 02/03/2016 | Not uploaded | 2799 days and counting |
| 10/14/2016 | 10/24/2016 | Not uploaded | 2535 days and counting |
| 02/17/2017 | 03/02/2017 | Not uploaded | 2406 days and counting |
| 04/13/2017 | 05/02/2017 | Not uploaded | 2345 days and counting |
| 11/09/2017 | 11/21/2017 | 06/25/2018 | 186 |
| 02/26/2018 | 03/07/2018 | 06/25/2018 | 80 |
| 01/18/2018 | 01/19/2018 | 06/25/2018 | 127 |
| 12/04/2019 | 01/02/2020 | 09/15/2020 | 227 |
| 01/16/2020 | 02/10/2020 | 09/15/2020 | 188 |
| 01/28/2021 | 02/25/2021 | 07/07/2021 | 102 |

13
14
15
16
17
18
19
20
21
22
23
24

[1] Length of days late for reports "Not uploaded" was calculated as of the date of the 60-Day Notice.

96.  Failure to upload samples within 30 days of obtaining the Laboratory results affects the SMARTS system algorithm that automatically calculates when a discharger enters into Level 1 status and notifies the Water Board.

97.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, pH affected substances, TSS, and O&G, are being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Upload Storm water Sample Analyses Within 30 Days

98.  Defendant EMCORE is required to submit sampling and analytical test results for all storm water sampling by uploading the data into the SMARTS system within thirty (30) days, pursuant to Section XI.B.11.a of the General Permit.

99.  On information and belief, EDEN alleges that Defendant failed to upload into SMARTS all of its storm water sampling and analytical results within thirty (30) days, a violation of the General Permit, as demonstrated in the following charts.

| Sample Date | Date of Laboratory Report | Date Uploaded into SMARTS | Length of Time Late |
|---|---|---|---|
| 11/09/2015 | 11/24/2015 | 04/25/2016 | 123 |
| 10/14/2016 | 10/24/2016 | 02/22/2017 | 91 |
| 11/09/2017 | 11/21/2017 | 02/13/2018 | 54 |
| 02/28/2016 | 03/07/2018 | 06/18/2018 | 73 |
| 01/08/2018 | 01/19/2018 | 06/19/2018 | 121 |
| 02/26/2018 | 03/07/2018 | 06/25/2018 | 80 |
| 11/29/2018 | 12/10/2018 | 06/21/2019 | 163 |
| 12/04/2019 | 01/02/2020 | 09/15/2020 | 227 |
| 01/16/2020 | 02/10/2020 | 09/15/2020 | 188 |
| 01/28/2021 | 02/25/2021 | 07/07/2021 | 102 |

100.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, pH affected substances, TSS, and O&G, are being discharged during rain events from the Facility to the San Francisco Bay.

1

<u>Failure to Analyze Storm Water Samples for the Correct Parameters – Hazardous Materials</u>

2      101.   Section XI.B.6.c of the General Permit requires EMCORE to analyze for any additional

3   parameters identified by EMCORE on a facility-specific basis that serve as indicators of the

4   presence of all industrial pollutants identified in the pollutant source assessment contained in the

5   Facility's SWPPP.

6      102.   On information and belief, EDEN alleges the Facility's SWPPP fails to identify additional

7   sampling parameters based on the Pollutant Source Assessment for, at a minimum, Aluminum

8   which are likely to be present in the production of Gyroscopes and likely to come into contact with

9   storm water.

10     103.   All of EMCORE's laboratory analytical reports for all samples collected failed to analyze

11   for the required parameter(s) of Aluminum.

12     104.   On information and belief, EDEN alleges EMCORE has failed to conduct an adequate

13   Potential Pollution Sources Assessment for their Facility for numerous metals and chemicals used

14   in its manufacturing of components.

15     105.   EMCORE's SWPPP's Potential Pollution Source Assessment is inadequate and in

16   violation of the General Permit because it only states "hazardous material" are found onsite

17   without actually identifying what metals and chemicals are located onsite.

18     106.   Failure to sample and analyze for the correct parameters allows harmful pollutants that

19   are present at the Facility to enter into the Waters of the United States without being addressed or

20   properly mitigated to prevent harm to the environment.

21     107.   Information available to EDEN indicates that as a result of these practices, storm water

22   containing excessive pollutants, including, but not limited to, pH affected substances, TSS,

23

24

O&G, and Aluminum are being discharged during rain events from the Facility to the San Francisco Bay.

Deficient Implementation of BAT/BCT and Minimum Best Management Practices (BMPs)

108.   EDEN is informed and believes that Defendant EMCORE has failed, since at least the beginning of the Facility's operations, to identify and implement Best Management Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants pursuant to Sections I.C, V.A. of the General Permit.

109.   EDEN is informed and believes that Defendant has also failed, since at least the beginning of the Facility's operations, to identify and implement Minimum BMPs including, but not limited to, measures for checking for spills and leaks; procedures to prevent material tracking offsite, implementing adequate clean-up methods for industrial materials; and protocols preventing the disposal of industrial materials into the storm water conveyance system pursuant to Section X.H.1.a.i-ix of the General Permit.

Falsification of Annual Reports Submitted to Regional Water Board

110.   EDEN is informed and believes that Defendants have submitted falsified Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI.L and XXI.N of the General Permit.

111.   Section XI.B of the General Permit provides that the Facility must collect and analyze two storm water samples in the first half of each reporting year (July 1 to December 31), and two samples in the second half of each reporting year (January 1 to June 30).

112.   On June 13, 2017 Defendant submitted its Annual Reports for the Fiscal Years 2016-17. Ms. Gila Hammock signed the Annual Report under penalty of perjury as the Legal Responsible Person ("LRP").

113.   Ms. Gila Hammock responded "Yes" to Question No. 3 on their Annual Reports ("Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?")

114.   On information and belief, EDEN alleges Defendant's LRP has failed to collect and analyze all the required storm water samples during reporting years in question.

115.   If a Facility does not collect four storm water samples during a particular reporting year, the reporting requirements of the General Permit require the Facility to indicate "NO" to Question NO. 3 on the Facility Annual Report and to provide an explanation for why the required number of samples were not collected. The explanation as to why there were insufficient QSEs is to be provided in Attachment 1 to the Annual Report.

116.   Records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years 2016 through 2017, there were sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Defendant to collect the requisite number of samples. Further, EDEN is informed and believes there were other Facilities near the Defendant's Facility that were able to collect the required number of storm water samples during the Reporting Period.

117.   Based on the foregoing, it is clear that Defendant's LRP intentionally made false statements in the Facility's Annual Reports when he indicated that the Facility had collected samples according to Section XI.B of the General Permit during the reporting years when in fact

the Facility did not collect the required number of samples, which is a violation of the General Permit.

118.  On June 21, 2029, Defendant EMCORE submitted its Annual Report for the Fiscal Year 2018-19. Ms. Hammock stated in Attachment 1 of the Annual Report that "sample person [was only] available for 3 of the 4 qualified events." EMCORE's explanation is insufficient and does not exclude EMCORE from performing the required number of samples pursuant to the General Permit. Section X.D.1 of the General Permit requires Defendant to have a Pollution Prevention Team in place that includes backup personnel for such situations.

119.  Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, pH affected substances, TSS, and O&G, are being discharged during rain events from the Facility to the San Francisco Bay.

Late-Filed Annual Reports and Failure to File Annual Report

120.  Defendant EMCORE has failed to comply with Section XVI.A of the General Permit, which provides as follows: "The Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS."

121.  Defendant's Annual Report for the reporting year 2017-18 was due on or before July 15, 2018. On information and belief, EDEN alleges Defendant failed to file the Annual Report until August 15, 2018, making it thirty-nine (39) days late.

122.  Defendant's Annual Report for the reporting year 2022-23 was due on or before July 15, 2023. On information and belief, EDEN alleges Defendant has failed to file the Annual Report as of the date of this Complaint.

1    <u>Failure to Comply with Facility's SWPPP</u>

2    123.  Section 19.2 of the Facility's SWPPP indicates the Facility will collect and analyze

3    storm water samples from two qualified storm events within the first half of each reporting year

4    (July 1 to December 31) and two QSEs within the second half of each reporting year (January 1

5    to June 30).

6    124.  As detailed above, the Defendant EMCORE missed collecting storm water samples in

7    the reporting years 2015-16 through 2022-23.

8    125.  Defendant has failed to adequately comply with Section 3 of the Facility SWPPP

9    concerning "Table 3 Minimum BMP's". Defendant has failed to perform Good Housekeeping on

10   a regular basis to mitigate the tracking of metals and chemicals off-site.

11   126.  The General Permit requires all Dischargers to develop and implement management

12   procedures to ensure that appropriate staff implements all elements of the Facility's SWPPP,

13   including the Monitoring Implementation Plan. EMCORE's failure to comply with the Facility's

14   SWPPP violates Section X.H.g of the General Permit.

15    <u>Failure to Train Employees</u>

16   127.  Sections X.D.1 and X.H.f of the General Permit requires all Facilities to designate a

17   Legally Responsible Person to implement the requirements of the Permit, who is then

18   responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly

19   trained in at least the following minimum requirements: BMP implementation, BMP

20   effectiveness evaluations, visual observations, and monitoring activities.

21   128.  Defendant's failure to train its employees and designate a Pollution Prevention Team is

22   evidenced by the Facility's failure to develop and implement a satisfactory SWPPP or adequate

23

24

BMPs at the Facility, failure to conduct monthly visual observations, and failure to fully comply with required storm water sampling and analysis procedures.

129.   On information and belief, EDEN alleges that Defendant failed to appoint a Pollution Prevention Team and/or adequate train its pollution prevention team for the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

130.   Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, pH affected substances, TSS, and O&G, are being discharged during rain events from the Facility to the San Francisco Bay.

131.   Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

**FIRST CAUSE OF ACTION**
**Failure to Develop a Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

132.   Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

133.   The General Permit requires dischargers of storm water associated with industrial activity to develop and implement a SWPPP and create a compliant Site Map.

134.   As outlined herein, Defendant have failed to develop and implement an adequate SWPPP or Site Map for the Facility.

135.   Each day since at least the beginning of the Facility's operations, that Defendant failed to develop an adequate SWPPP and Site Map for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendant.

**SECOND CAUSE OF ACTION**
**Failure to Develop a Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

136.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

137.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

138.    As outlined herein, Defendant has failed to develop and implement a monitoring and reporting program for its Facility.

139.    Defendant's ongoing failure to develop and implement a monitoring and reporting program are evidenced by its failure to collect storm water samples pursuant to the requirements of the General Permit.

140.    Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop and implement a monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant. The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

**THIRD CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

141.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

142.    The General Permit's SWPPP requirements and Effluent Limitation Section V.A of the General Permit require dischargers to reduce or prevent pollutants in their storm water

discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

143.  Defendant has failed to implement BAT and BCT at the Facility for pollutants of pH affected substances, Total Suspended Solids ("TSS"), Oil & Grease ("O&G"), and other potentially un-monitored pollutants, in violation of Effluent Limitation Section V.A of the General Permit.

144.  Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant.

**FOURTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

145.  Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

146.  Discharge Prohibition Section III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Section VI.B of the General Permit prohibits storm water discharges to any surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

147.   Plaintiff is informed and believes, and thereupon alleges, that since at least the beginning of the Facility's operations, Defendant has been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D of the General Permit.

148.   Plaintiff is informed and believes, and thereupon alleges, that since at least the beginning of the Facility's operations, Defendant has allowed contaminated storm water to flow into the Suisun Bay a tributary of San Francisco Bay, in excess of applicable water quality standards in violation of Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D of the General Permit.

149.   During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with, but not limited to, pH affected substances, TSS, O&G, and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then discharges untreated into the MS4, which ultimately ends up in the San Francisco Bay.

150.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

151.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

152.   Every day since at least the beginning of Facility's operations, that Defendant has discharged and continues to discharge polluted storm water from its Facility in violation of the

General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant. These violations are ongoing and continuous.

**FIFTH CAUSE OF ACTION**
**Failure to Properly Train Facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

153. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

154. Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team who is then responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

155. Section X.H.f of the General Permit also requires that each facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a Qualified Industrial Storm Water Practitioner ("QISP").

156. Since at least the beginning of Facility's operations, Defendant has failed to properly train Facility employees and the designated members of its Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.

## SIXTH CAUSE OF ACTION
### Recovery Under the Catalyst Theory CCP §1021.5

157.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

158.   Under the substantive law of California, if a plaintiff is a catalyst in encouraging a Defendant to voluntarily comply with its legal obligations, the plaintiff may recover its fees and costs.  *Graham v. DaimlerChrysler Corp*., 101 P.3d 140, 21 Cal. Rptr. 3d 331, 34 Cal. 4th 553 (2004), *Tipton-Wittingham v. City of Los Angeles* (Cal. Dec. 2, 2004), 34 Cal.4th 604, 21 Cal.Rptr.3d 371, 101 P.3d. 174, 2004 Cal. LEXIS 11335.

159.   A requirement for recovery under the catalyst theory is that a plaintiff first advice the Defendant of the claim and provide an opportunity to resolve the matter.  The Plaintiff in this case complied by providing both the catalyst and the written notice of the claim to Defendant prior to suit as demonstrated in EDEN's Notice of Intent to Sue attached hereto as Exhibit A, and incorporated herein by reference. Exhibit A, 60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").

160.   In the event Defendant allege the claims are moot or are non-justiciable, then Plaintiff must be awarded its fees and costs under California Code of Civil Procedure Section 1021.5 ("Catalyst Theory").

161.   Since the substantive law of California governs awards of Catalyst Theory fees (as opposed to Federal law), Plaintiff requests the Court exercise supplemental jurisdiction over any award of Catalyst Theory fees.

### RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.  Declare Defendant to have violated and to be in violation of the CWA;

2.  Issue an injunction ordering Defendant to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.  Enjoin Defendant from discharging pollutants from Defendant's Facility to the surface waters surrounding the Facility until such time as Defendant has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

5.  Order Defendant to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

6.  Order Defendant to take appropriate actions to restore the quality of United States waters impaired by its activities at Defendant's Facility;

7.  Order Defendant to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

8.  Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendant was the catalyst for Defendant's voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendant undertook any such corrective action after receiving Plaintiff's Notice, and;

9.  Award such other and further relief as may be just and proper.

Dated:  January 16, 2024                Respectfully,


                                        By: _/s/ Craig A. Brandt___
                                        Craig A. Brandt
                                        Attorney for Plaintiff